IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

**PEGGY SUE MCKINNEY,**

        Plaintiff,

**v.**

        **CIVIL ACTION NO.: 3:16-CV-25 (GROH)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

        Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On March 2, 2016, Plaintiff Peggy Sue McKinney ("Plaintiff"), through counsel Christina J. Rumbach, Esq.,[1] filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On May 4, 2016, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 8; Admin. R., ECF No. 9). On June 3, 2016, and June 30, 2016, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 15; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 16). The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge

---

[1] On May 25, 2016, Plaintiff filed a Motion to Substitute Counsel [ECF No. 13] to Angela Marie White, Esq., of Legal Aid of West Virginia, Inc., which was granted.

pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On February 29, 2012, Plaintiff protectively filed a Title XVI claim for supplemental security income ("SSI") benefits, alleging disability that began on March 20, 2004. (R. 27, 168). Plaintiff's claim was initially denied on June 5, 2012, and denied again upon reconsideration on February 4, 2013. (R. 113, 118). After these denials, Plaintiff filed a written request for a hearing. (R. 27, 121).

On August 18, 2014, a hearing was held before United States Administrative Law Judge ("ALJ") Karen B. Kostol in Morgantown, West Virginia. (R. 27, 38, 135). Plaintiff, represented by Janice Jackson, a paralegal, appeared and testified at the hearing, as did Linda Dezack,[2] an impartial vocational expert. (R. 27, 38, 41). During the hearing, Plaintiff amended her alleged onset date to February 29, 2012. (R. 182). On September 25, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 24). On January 11, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.  BACKGROUND

### A.  Personal History

Plaintiff was born on July 17, 1965, and was forty-six years old at the time she filed her claim for SSI benefits. (See R. 79). She is 5'4" tall and weighs approximately

---

[2] Ms. Dezack's colleague, Vanessa Beam, also appeared at the administrative hearing but did not present any testimony. (R. 27).

115 pounds. (R. 196). She is separated from her husband and lives with her eight-year-old daughter[3] in a mobile home. (R. 45-46, 219). She completed school through the eighth grade. (R. 197). While in school, she was enrolled in special education classes. (Id.). She has not received any specialized, trade or vocational training. (Id.). She does not possess a driver's license. (R. 46). Her prior work experience includes working as a convenience store clerk for BFS Foods. (R. 71). She alleges that she is unable to work due to the follow ailments: (1) a learning disability; (2) an inability to read or write; (3) concentration and memory impairments; (4) arthritis in her hands and fingers; (5) depression; (6) anxiety; (7) bipolar disorder; (8) breathing impairments and (7) a back impairment. (R. 196, 228).

## B.    Medical History

### 1.  Medical History Pre-Dating Alleged Onset Date of February 29, 2012

On January 20, 2010, Plaintiff presented to a West Virginia University ("WVU") Healthcare clinic in Morgantown, West Virginia, where she received primary care. (R. 320). At this time, the clinic listed the following as Plaintiff's active diagnoses: (1) headaches; (2) chronic obstructive pulmonary disorder ("COPD"); (3) spinal stenosis and (4) anxiety. (Id.). The clinic further listed an albuterol inhaler and Xanax as Plaintiff's active prescriptions. (Id.). During the visit, Plaintiff stated that she was experiencing difficulty controlling her temper and moods and would at times undergo "shaking spells" and "hair pulling episodes." (Id.). After an examination, it was noted that Plaintiff smoked half a pack of cigarettes a day and was not interested in quitting because "she uses it to help control her moods." (Id.). To treat Plaintiff's complaints of anxiety, Celexa and hydroxyzine were prescribed and Plaintiff was referred to behavioral medicine. (R. 321).

---

[3] Plaintiff adopted her granddaughter at birth. (R. 46, 68).

On October 28, 2011, Plaintiff returned to the WVU Healthcare clinic, complaining of increased anxiety. (R. 322). Plaintiff stated that she was no longer prescribed Xanax and that she had stopped taking her Celexa prescription because it "did not help." (R. 322, 324). Plaintiff also stated that, in addition to feelings of anxiousness, she was experiencing fatigue and headaches. (R. 322). After an examination, Plaintiff was prescribed Zoloft, an antidepressant, and referred to a therapist. (R. 324).

### 2. Medical History Post-Dating Alleged Onset Date of February 29, 2012

On April 13, 2012, Plaintiff presented to Valley HealthCare for her therapy referral appointment. (R. 342). During her initial evaluation, Plaintiff complained of anxiety and panic symptoms. (Id.). She stated that she had suffered from anxiety since her childhood but that it had increased recently due to family issues. (Id.). At the end of the evaluation, Plaintiff was diagnosed with generalized anxiety disorder and panic disorder and referred for a psychiatric evaluation. (R. 342-43).

On June 25, 2012, Plaintiff returned to Valley HealthCare for a psychiatric evaluation. (R. 345-49). Lesa Feather, PA-C, a physician's assistant, performed the evaluation while Dilip Chandran, M.D., a licensed psychiatrist, supervised her. (R. 347). During this evaluation, Plaintiff stated that she was experiencing anxiety and mood swings. (R. 345). Plaintiff further stated that she spends twenty hours every week volunteering but that "it was recommended that she get back to a doctor to get put on medication because she is not able to do her [volunteer] job at the level that she needs to because of her anger, agitation and mood swings." (Id.). Plaintiff was diagnosed with bipolar effective disorder, type I, and generalized anxiety disorder. (R. 346). To treat

these conditions, Plaintiff was prescribed Depakote sprinkles. (Id.). However, when Plaintiff returned for a follow-up appointment on July 23, 2012, she reported that the Depakote sprinkles had caused severe nausea and vomiting after the first dose and that she "ha[d] not tried it again since." (R. 349). She further reported that she had tried lithium and Seroquel in the past with similar results. (Id.). Therefore, Plaintiff's Depakote prescription was changed to Abilify. (Id.).

On August 12, 2012, Plaintiff was out shopping when she slipped on some water on the floor of a store and fell. (R. 325). After her fall, Plaintiff was able "to get up by herself and dr[ive] herself home." (Id.). However, once she was home, she found the pain in her back and left hip "unbearable" and called for an ambulance, after which was taken to Ruby Memorial Hospital's emergency department ("ER"). (Id.). In the ER, X-rays of Plaintiff lumbar spine and left hip were ordered, which showed no evidence of a fracture. (R. 327). Therefore, Plaintiff was diagnosed with a lumbosacral strain and discharged home on Robaxin and Motrin for her pain. (R. 327, 329).

On October 8, 2012, Plaintiff presented to Valley HealthCare for a follow-up appointment regarding her anxiety. (R. 352). During this appointment, it was noted that Plaintiff had canceled her previous three scheduled appointments due to transportation issues. (R. 350-52). Because of her canceled appointments, Plaintiff's Abilify prescription had expired. (R. 352). When asked if the Abilify had been effective, Plaintiff stated that it had "helped" and that, while she had still experienced difficulty sleeping and some depressive symptoms, she had been feeling less anxious and her moods had been more stable. (Id.). Therefore, Plaintiff was given a refill of her Abilify prescription. (Id.).

On March 20, 2013, Plaintiff presented to the WVU Healthcare clinic, complaining of back pain and muscle spasms. (R. 418). During an examination, it was noted that Plaintiff suffered from "scoliosis with a left thoracic deviation."[4] (R. 419). An X-ray of Plaintiff's thoracic spine was ordered, which revealed that Plaintiff suffers from osteopenia, in addition to scoliosis. (Id.). Plaintiff was diagnosed with upper back pain and prescribed Flexeril for her muscles spasms and Voltaren for her pain. (Id.). Plaintiff was also referred to physical therapy for upper extremity and upper back strengthening.[5] (Id.).

On April 1, 2013, Plaintiff presented to Valley HealthCare for another follow-up appointment regarding her anxiety. (R. 450). During this visit, it was noted that:

> At the last visit, [Plaintiff] had been noncompliant with her medication and Rational Drug Therapy would not approve the Abilify that she had previously been taking and so we ended up putting her on immediate release Seroquel . . . . [Plaintiff] states that the last time she was here, she lost her wallet. She is not sure if she lost it in this building or on the bus but she has not been able to retrieve it. It had her . . . prescriptions in it. [Plaintiff] states she tried calling Valley but nobody answered and, therefore, she has not been on any of her psychotropic medications for the last 6 weeks.

---

[4] Plaintiff later stated that she had been diagnosed with scoliosis as a child and instructed to wear a back brace but that her family could not afford the brace. (R. 369).

[5] On March 26, 2013, Plaintiff presented to Dynamic Physical Therapy for her referral appointment. (R. 369). After an initial evaluation, Plaintiff was diagnosed with vertebropelvic malalignment but her rehabilitation potential was documented as "[g]ood." (R. 371). Accordingly, Plaintiff was instructed to participate in a physical therapy program twice a week for ten weeks. (R. 372). For the first few weeks, Plaintiff presented for her sessions as scheduled. (R. 375-97). However, on June 11, 2013, her physical therapist documented that Plaintiff "ha[d] not been to . . . therapy in 7 weeks" because she "ha[d] gone on a few trips." (R. 397). The therapist further documented that Plaintiff had "camped out on rocks over the weekend" and, as a result, was complaining of increased back pain. (Id.). After this date, Plaintiff continued attending her sessions but only until the end of July. (R. 397-17). As a result, on August 30, 2013, Plaintiff was discharged from the program due to noncompliance. (See R. 417). On that same day, her therapist noted that Plaintiff had been "demonstrating progress towards [her] goals when she was attending therapy consistently" and had "demonstrated much improvement in function." (Id.).

(Id.). It was further noted that Plaintiff "look[ed] bad," exhausted and sleep deprived. (Id.). Plaintiff was given a new Seroquel prescription. (Id.). It was also "explained . . . that her chronic noncompliance . . . [has] to stop because we cannot get her better if she does not do her part, take her medications and contact us if things are not going well."  (Id.).

On April 4, 2013, Plaintiff presented to the WVU Healthcare clinic, complaining of neck and back pain. (R. 423). It was noted that Plaintiff had not been taking her medications as prescribed. (Id.) (noting that Plaintiff took Flexeril for one week only, did not recall ever taking her Robaxin and did not get her tramadol prescription filled). After an examination, Plaintiff was diagnosed with thoracic back pain, upper trapezius spasm, scapular dyskinesis and compensatory lumbar strain. (Id.). Plaintiff was prescribed Skelaxin and instructed to continue participating in physical therapy. (R. 423-24).

On June 14, 2013, Plaintiff returned to the WVU Healthcare clinic, complaining of wheezing and shortness of breath on exertion. (R. 424-25). Plaintiff stated that "she is very active and has to use her albuterol [inhaler] 3-4 times/day." (R. 425). She further stated that, while she has smoked two to three packs of cigarettes a day for the past thirty-five years, she had cut down to five cigarettes a day and was ready to try to quit. (Id.). Pulmonary function testing was ordered, which revealed a "severe obstructive pattern." (R. 431). Therefore, Plaintiff was diagnosed with COPD, dyspnea/wheezing on exertion and nicotine dependence. (R. 426). Plaintiff was prescribed a Combivent inhaler in addition to her albuterol inhaler and instructed to call her insurance company for nicotine patches. (R. 425-26, 428). Subsequently, during several follow-up

appointments, it was documented that Plaintiff's COPD was stable but that she had not yet quit smoking. (R. 431, 438).

Over the next several months, Plaintiff presented to Valley HealthCare for routine appointments. On June 17, 2013, Plaintiff reported that she had taken Seroquel for one month but that it caused her to sleep all the time so she ceased taking it. (R. 452). Therefore, Plaintiff's prescription was changed back to Abilify. (Id.). On July 22, 2013, it was documented that Plaintiff was "doing tremendously better" on Abilify. (R. 454). On October 9, 2013, Plaintiff reported that, while her mood was stable, she was having "a lot of panic attacks." (R. 455). As a result, Plaintiff was prescribed Xanax and instructed to keep taking Abilify. (Id.). On November 13, 2013, Plaintiff's prescriptions of Xanax and Abilify were increased after Plaintiff stated that "she's been having a lot more stressors lately" and could "not stay[ ] calm." (R. 456). On December 17, 2013, Plaintiff reported that her increased prescriptions "ha[d] done amazing" and that "overall she [wa]s doing much better." (R. 459). However, on January 15, 2015, Plaintiff stated that she "ha[d] not been able to get her Abilify [for a period of time] due to insurance reasons" and that, consequently, she had been suffering from increased anxiety. (R. 461). While Plaintiff stated that her Abilify prescription had since been authorized by her insurance company and was "at her pharmacy," Plaintiff's prescription of Xanax was increased nevertheless. (Id.).

On January 16, 2014, Plaintiff presented to the WVU Healthcare clinic[6] for a routine appointment. (R. 440). During this appointment, Plaintiff complained of upper back pain. (Id.). It was noted that:

---

[6] On August 16, 2014, Plaintiff submitted a form entitled Claimant's Recent Medical Treatment, in which she reports that a physician at the WVU Healthcare clinic "wants [her] to

> [I]maging [of Plaintiff's back] reveals S-shaped curvature of the spine with multilevel degenerative changes and osteophyte formation. . . . [H]er [back] symptoms are secondary to the findings above as this is chronic in nature with no acute change. There are no alarming symptoms as well . . . .

(R. 441). Because Plaintiff reported that Aleve failed to alleviate her pain, Plaintiff was instructed to take Tylenol instead of Aleve and was prescribed Voltaren gel to apply to her back. (R. 445). However, during a follow-up appointment, Plaintiff stated that her back pain was "getting worse" and Plaintiff was diagnosed with thoracic spine pain, paraspinal spasms and "likely scapular dyskinesia." (R. 446, 449). As a result, Plaintiff's Voltaren prescription was changed from gel to tablets and Plaintiff was referred to physical therapy. (R. 449).

Over the next few months, Plaintiff continued to present to Valley HealthCare for routine appointments. On February 26, 2014, Plaintiff reported that her anxiety had increased. (R. 463). However, Plaintiff further reported that "[it] took three months for her Abilify to be approved" by her insurance company and that, once it was approved and her prescription could be filled, she did not start on a low dose and gradually increase it but immediately started taking her previous dose again. (Id.). Therefore, Plaintiff was instructed to decrease her dose of Abilify and to slowly increase it. (Id.). For the meantime, Plaintiff's Xanax prescription was increased. (Id.). On March 18, 2014, Plaintiff stated that her "meds [were] working[ ] but they just [were] not strong enough." (R. 465). While Plaintiff requested that her Xanax and Abilify prescriptions be increased, Plaintiff did not receive approval for her request. (See R. 466-68). On May 15, 2014, it was documented that Plaintiff's mood was stable and that she "appear[ed] to be doing fairly well on this combination of medications." (R. 468). It was also documented that "[i]t

---

have therapy with needle treatment." (R. 259).

is not clear that she truly has a diagnosis of bipolar disorder" and Plaintiff's diagnosis of bipolar disorder was changed to an "[u]nspecified episodic mood disorder." (Id.).

### 3. Medical Reports/Opinions

#### a. Psychological Evaluation by Andrew M. Everly, M.S., and Sheri E. Coleman, M.A., December 30, 2011

On December 30, 2011, Andrew M. Everly, M.S., a supervised psychologist, performed a Psychological Evaluation of Plaintiff while Sheri E. Coleman, M.A., a supervising licensed psychologist, oversaw the evaluation. (R. 288-95). The evaluation consisted of a mental status examination, Wechsler Adult Intelligence Scale-IV ("WAIS-IV") test, Beck Depression Inventory-Second Edition ("BDI-II") test and Beck Anxiety Inventory ("BAI") test. (R. 288). While Dr. Everly wished to conduct achievement testing, Plaintiff was unable to participate in it "because of illiteracy." (R. 294).

The mental status examination revealed mostly normal results. (See R. 289). However, Dr. Everly noted that Plaintiff's judgment and attention/concentration were mildly deficient and that her recent memory and ability to think abstractly were moderately deficient. (Id.).

The WAIS-IV test revealed that Plaintiff possesses a full scale IQ of 67. (R. 290). Dr. Everly noted that these results "indicated that [Plaintiff] is functioning in the Extremely Low range." (R. 291). However, Dr. Everly further noted that the "results . . . were actually in the high end of the Extremely Low range." (R. 294). When discussing the accuracy of the results, Dr. Everly documented that "[d]ue to the error inherent in any assessment instrument, there is a 95% probability that the 'true score' falls between 64 and 72." (R. 291).

The BDI-II test was administered "as a measure of overall level of self-reported depression." (R. 294). Dr. Everly noted that Plaintiff's results for this test were within the "[m]inimal range." (Id.). Likewise, the BAI test, which was administered "as a measure of subjectively experienced anxiety," showed results within the "[m]inimal range." (Id.).

After completing the Psychological Evaluation, Dr. Everly concluded that Plaintiff suffers from borderline intellectual functioning. (Id.). He opined that:

> [A] specific learning disability is not present. . . . This appears to be the result of low cognitive functioning and limited schooling, rather than a learning disability.

(Id.). Dr. Everly further opined that Plaintiff would benefit from vocational rehabilitation services but that her "[v]ocational potential is limited." (R. 295).

### b. Disability Determination Examination by Sushil M. Sethi, M.D., May 28, 2012

On May 28, 2012, Sushil M. Sethi, M.D., performed a Disability Determination Examination ("DDE") of Plaintiff. (R. 310-14). Plaintiff was accompanied to the DDE "by a legal aide who . . . help[ed] . . . guide her in filling out papers and giving background information. (R. 311). The DDE consisted of a clinical interview and a physical examination of Plaintiff. (See R. 310-14). During the clinical interview, Plaintiff informed Dr. Sethi that she has suffered from back pain since her childhood, "possibly caused by undiagnosed scoliosis." (R. 310). Plaintiff further informed Dr. Sethi that she suffers from anxiety, obsessive compulsive disorder and concentration and memory problems. (Id.). Finally, Plaintiff informed Dr. Sethi that she suffers from migraines and has a history of depression. (R. 310-11).

After the clinical interview, Dr. Sethi performed a physical examination of Plaintiff. (R. 311-14). While this examination revealed mostly normal findings, Dr. Sethi

documented several abnormal findings. (See id.). Specifically, Dr. Sethi noted moderate tenderness in Plaintiff's upper mid-thoracic area and a decreased range of motion of her lumbar spine. (R. 311, 314).

After completing the clinical interview and physical examination of Plaintiff, Dr. Sethi concluded that Plaintiff suffers from: (1) a history of chronic arthritic complaints; (2) scoliosis; (3) headaches; (4) anxiety and (5) depression. (R. 312). Dr. Sethi opined that, due to these impairments, Plaintiff's "ability to work at physical activities may be moderately affected." (Id.).

### c. Disability Determination Explanation by Carl Bancoff, M.D., June 4, 2012

On June 4, 2012, Carl Bancoff, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 79-90). Prior to drafting the Initial Explanation, Dr. Bancoff reviewed, inter alia, Plaintiff's medical records, treatment notes and First Adult Function Report. (R. 80-82). After reviewing these documents, Dr. Bancoff concluded that Plaintiff suffers from a severe impairment, borderline intellectual functioning, and a non-severe impairment, osteoarthrosis and allied disorders. (R. 83).

In the Initial Explanation, Dr. Bancoff completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 86-87). During this assessment, Dr. Bancoff found that, while Plaintiff possesses no manipulative, visual, communicative or environmental limitations, Plaintiff possesses exertional and postural limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Bancoff found that Plaintiff is able to: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4)

sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 86). Regarding Plaintiff's postural limitations, Dr. Bancoff found that Plaintiff is able to frequently climb ramps/stairs, balance, stoop, kneel, crouch and crawl but only occasionally climb ladders/ropes/scaffolds. (Id.). After completing the RFC assessment, Dr. Bancoff determined that Plaintiff is able to perform medium-level work. (R. 90).

Also in the Initial Explanation, Corine Samwel, Ph.D., a state agency psychologist, completed a Mental RFC Assessment of Plaintiff and a Psychiatric Review Technique form. (R. 83-85, 87-89). When completing the Mental RFC Assessment, Dr. Samwel found that Plaintiff possesses no social interaction limitations or adaptation limitations. (R. 87-88). However, Dr. Samwel further found that Plaintiff possesses understanding and memory limitations and sustained concentration and persistence limitations. (Id.). Regarding her understanding and memory limitations, Dr. Samwel found that Plaintiff is not significantly limited in her ability to remember locations and work-like procedures or to understand and remember very short and simple instructions. (Id.). Dr. Samwel further found that Plaintiff is moderately limited in her ability to understand and remember detailed instructions but is capable of performing simple, routine and repetitive tasks. (Id.).

Regarding her sustained concentration and persistence limitations, Dr. Samwel found that Plaintiff is not significantly limited in her ability to: (1) carry out very short and simple instructions; (2) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being

distracted by them and (5) make simple work-related decisions. (Id.). Additionally, Dr. Samwel found that Plaintiff is moderately limited in her ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.).

When completing the Psychiatric Review Technique form, Dr. Samwel analyzed the degree of Plaintiff's functional limitations. (R. 84). Specifically, Dr. Samwel rated Plaintiff's difficulties in maintaining concentration, persistence or pace as "moderate." (Id.). Dr. Samwel further rated Plaintiff's restriction of her activities of daily living and difficulties in maintaining social functioning as "none." (Id.). Finally, Dr. Samwel rated Plaintiff's episodes of decompensation as "none." (Id.).

### d. Disability Determination Explanation by Dominic Gaziano, M.D., February 2, 2013

On February 2, 2013, Dominic Gaziano, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 93-106). Prior to drafting the Reconsideration Explanation, Dr. Gaziano reviewed the same documents that Dr. Bancoff had reviewed when drafting the Initial Explanation, in addition to Plaintiff's updated medical records, Personal Pain Questionnaire and Second Adult Function Report. (R. 94-97). After reviewing these documents, Dr. Gaziano largely agreed with Dr. Bancoff's opinions but dissented from two of his findings regarding Plaintiff's exertional limitations. (R. 101). Specifically, Dr. Gaziano determined that Plaintiff is able to occasionally lift and/or carry

twenty-five, not fifty, pounds and frequently lift and/or carry ten, not twenty-five, pounds. (Id.).

Also in the Reconsideration Explanation, Karl G. Hursey, M.D., a state agency psychological consultant, reviewed Dr. Samwel's Mental RFC Assessment and Psychiatric Review Technique form from the Initial Explanation. (R. 99-100, 103-05). After reviewing these documents, Dr. Hursey agreed with all of the findings contained within the reports. (Id.).

C.    **Testimonial Evidence**

During the administrative hearing on August 18, 2014, Plaintiff divulged her relevant personal facts and work history. Plaintiff is married but has been separated from her husband for "about seven years." (R. 45). She lives with her eight-year-old grandchild, who she adopted at birth. (R. 46, 68). She cares for the child herself. (R. 46, 68-69) (explaining that her eldest son, the biological father, does not assist with childcare and that her husband only visits the child once a month).

She was enrolled in special education classes throughout elementary and junior high school and stopped attending school after the eighth grade.[7] (R. 46, 50-51). She never obtained a GED and has difficulty reading and writing. (R. 46). She can read "basic stuff" such as grocery lists and write "[a] little." (R. 47, 52). She is able to perform simple mathematical calculations but not well. (R. 47). She currently participates in the West Virginia Department of Health and Human Resource's WV WORKS program, which requires her to perform secretarial work such as answering telephones at her local Salvation Army facility for five hours every week. (R. 52-53). Previously, Plaintiff

---

[7] Although Plaintiff requested her school records for her SSI application, she was informed that the records were destroyed in the year 2013. (R. 262).

worked, *inter alia*, at a BFS convenience store, where her job duties included operating a cash register. (R. 55-56). Plaintiff was able to perform her duties because her manager was patient and took the time to teach Plaintiff what she needed to do. (R. 55). When that manager left, Plaintiff quit her job because the replacement manager did not teach her "the rest of the stuff that [she] needed to know." (R. 56). Plaintiff quit additional jobs over the years because she is unable to operate cash registers due to an inability to read the machines. (R. 53-57).

Plaintiff testified that the primary reason she cannot work is because she cannot read. (R. 65). However, Plaintiff further testified that several impairments additionally prevent her from working. First, Plaintiff testified that she suffers from COPD and that she cannot partake in prolonged activity without resorting to using her inhaler. (R. 57, 64). Second, Plaintiff testified that she suffers from migraine headaches. (R. 64-65). Plaintiff explains that her headaches are caused by severe allergies and that, while they used to occur more frequently, she only experiences "maybe [one] a month now." (R. 65). Third, Plaintiff testified that she suffers from "nervous conditions." (R. 57). More specifically, Plaintiff testified that she has been diagnosed with depression and anxiety and experiences panic attacks "at least two or three times a week." (R. 57-58). Plaintiff states that, because of her nervous conditions, she gets upset easily, becomes agitated in crowds and experiences episodes where she pulls her hair out and/or scratches her arms, face and head.[8] (R. 59-60, 65). Plaintiff further states that her depression causes her to have good and bad days but that she has not experienced many good days since her mother passed away three months prior to the hearing. (R. 65-66). To treat her

---

[8] Ms. Jackson, the paralegal representing Plaintiff during the administrative hearing, noted the presence of scars on Plaintiff's face during the hearing. (R. 60).

symptoms, Plaintiff declared that she participates in counseling once a month and takes Abilify and Xanax. (R. 58-59).

Finally, Plaintiff testified regarding her routine activities. On a typical day, Plaintiff awakens at 6:00 A.M. (R. 61). She then drinks coffee, washes the dishes, prepares breakfast for her daughter and accompanies her daughter to the bus stop. (Id.). After her daughter leaves for school, Plaintiff cleans her house and travels to any scheduled appointments she might have that day. (Id.). Once a month, Plaintiff attends church. (R. 67).

**D.     Vocational Evidence**

**1.  Vocational Testimony**

Linda Dezack, an impartial vocational expert, also testified during the administrative hearing. (R. 69-76). Initially, Ms. Dezack testified regarding the characteristics of Plaintiff's past relevant work. (R. 71). Specifically, Ms. Dezack testified that Plaintiff has worked as a convenience store clerk. (Id.). Ms. Dezack characterized the job as a light exertional, unskilled position. (Id.).

After Ms. Dezack described Plaintiff's past relevant work, the ALJ presented several hypothetical questions for Ms. Dezack's consideration. In the base hypothetical, the ALJ asked Ms. Dezack to:

> [A]ssume an individual the same age, education, past work experience as [Plaintiff] with the following abilities: said individual is capable of light exertional level work; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and/or stairs, balance, stoop, crouch, kneel, or crawl. Said individual must avoid concentrated exposure to irritants such as fumes, odors, dust, and gases; and concentrated exposure to wetness or humidity; and also, concentrated exposure to extreme cold. Said individual is limited to simple, routine, and repetitive tasks in a low-stress job, defined as having only occasional decision making, occasional changes in the works setting, and no strict production quotas.

17

(R. 71-72). The ALJ then asked Ms. Dezack whether the hypothetical individual could perform Plaintiff's past work as a convenience store clerk, to which Ms. Dezack responded in the affirmative. (R. 72). The ALJ then repeated her question with the additional limitation that the hypothetical individual interact only occasionally with the general public, co-workers and supervisors. (Id.). Ms. Dezack responded that such an individual could not work as a convenience store clerk but could work as a laundry worker, housekeeper and clothes folder. (R. 72-73).

Subsequently, the ALJ asked whether the hypothetical individual could work as a laundry worker, housekeeper and clothes folder with the addition of the following limitations: (1) no complex written or verbal communication skills; (2) a second-grade reading capacity and (3) a sit/stand option.[9] (R. 73-74). Ms. Dezack responded in the affirmative. (Id.).

The ALJ then returned to her base hypothetical but added the following limitations: (1) no complex verbal or written communication; (2) a second-grade reading capacity and (3) a sit/stand option. (Id.). Ms. Dezack responded that, even with the additional limitations, the individual could still work as a convenience store clerk. (Id.).

The ALJ also asked Ms. Dezack:

> With all of the limitations previously given with the exception that it would take out the second grade reading level for the first hypothetical that I'm going to add that in the second one, what jobs would be available? At sedentary, I would like the job to not require complex written or verbal communication.

---

[9] The ALJ defined the sit/stand option in the following manner: "[Plaintiff] must be afforded the opportunity for brief, one- to two- minute changes of position at intervals not to exceed 30 minutes without being off task." (R. 74).

(R. 74). Ms. Dezack responded that such an individual could work as a glass waxer, hand sorter and final assembler. (Id.). The ALJ asked whether the hypothetical individual could work as a glass waxer, hand sorter or final assembler if he or she could only read at a second-grade level, to which Ms. Dezack responded in the affirmative. (R. 75).

The ALJ then asked whether Plaintiff possesses any transferable skills "that would fit into the sedentary exertional level . . . hypothetical given . . . [w]ith occasional people contact," to which Ms. Dezack responded in the negative. (Id.). Finally, the ALJ asked whether a hypothetical individual could find work if he or she "were off task [or] were to miss . . . 20 percent of the work week or greater," to which Ms. Dezack again responded in the negative. (Id.). After the ALJ's hypothetical questions, Ms. Dezack declared that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"). (R. 75-76).

### 2. Report of Contact Forms & Disability Reports

On or about March 16, 2012, Colleen C. Orth, Esq., of Legal Aid of West Virginia, Inc., completed a Disability Report on behalf of Plaintiff. (R. 195-96, 228). In this report, Ms. Orth indicated that the following ailments limit Plaintiff's ability to work: (1) a back impairment; (2) learning disability; (3) inability to read or write; (4) concentration and memory impairments; (5) arthritis in her hands and fingers; (6) depression and (7) anxiety. (R. 196). Ms. Orth further indicated that she stopped working on September 30,

2011, "[b]ecause of her conditions" and "[b]ecause of other reasons." (Id.). Ms. Orth explained that:

> [Plaintiff] was hired at a Wendy's fast-food chain in Sabraton, WV originally as a cashier; she did not originally tell her employer about her lack of reading and writing skills because of her strong desire to gain employment. As a cashier, she could not read the menu or enter orders in the register and worked at an exceptionally slower pace than her co-workers. When her employer discovered her inability to read and write, she became a custodian. She claims that over time, her employer continually cut back her hours until she was no longer on the schedule.

(R. 197). Ms. Orth estimated that, even though Plaintiff stopped working for other reasons, her impairments became severe enough to prevent her from working on January 1, 2000. (Id.). Ms. Orth also emphasized that Plaintiff "has a strong desire to work" and has been partaking in "educational testing." (R. 202).

On April 27, 2012, Diane L. Snyder, from the Disability Determination Section ("DDS") office in Clarksburg, West Virginia, completed a Report of Contact form regarding Plaintiff. (R. 209). On this form, Ms. Snyder discussed Plaintiff's work history. (Id.). Specifically, Ms. Snyder reported that, most recently, Plaintiff worked at Wendy's, where she washed dishes and cleaned and mopped floors. (Id.). She further reported that Plaintiff has previously worked at a BP gas station as a cashier. (Id.). Ms. Snyder stated that Plaintiff's job duties as a cashier included operating an "old fashioned" cash register that "did [the] math for her," waiting on customers and cleaning and mopping floors.[10] (Id.).

Plaintiff submitted two Disability Report-Appeal forms. (R. 228-32, 253-57). On or about October 9, 2012, Plaintiff indicated that, since her last Disability Report, she had

_____

[10] On August 16, 2014, Plaintiff submitted a form entitled Claimant's Work Background, in which she specified that she worked at Wendy's for about two weeks and for the BP gas station for about two years. (R. 258).

been diagnosed with bipolar disorder and breathing problems. (R. 228, 253). Plaintiff

further indicated that she is prescribed Abilify for her bipolar disorder and an albuterol

inhaler for her breathing problems. (R. 230). On a subsequent undated form, Plaintiff

indicated that, while no changes to her condition had occurred, she had been seeking

further mental health treatment since her last report. (R. 253-54).

### 3. Vocational Assessment Report

On January 28, 2011, Valeria T. Stansberry, M.S., C.R.C., of the West Virginia

Department of Health and Human Resources, performed a Vocational Assessment of

Plaintiff.[11] (R. 274-86). During the Vocational Assessment, Ms. Stansberry documented

Plaintiff's behavior. (R. 279). Specifically, Ms. Stansberry documented:

> [I]t should be noted that [Plaintiff] verbally expressed eagerness to move
> through the assessment process quickly because her adopted
> granddaughter was ill, and her son was watching her until she arrived
> home. . . . She further stated that she could read without her glasses.
> When Assessor requested [Plaintiff] to read and sign program
> documentation she did so without questions or concerns. Assessor asked
> if she would like the information read aloud to her but declined the offer by
> saying "no." Assessor followed by asking if she understood what the forms
> meant; and she said "yes" and declined Assessor to re-read the
> documents aloud. . . .

(Id.).

At the conclusion of testing, Ms. Stansberry determined that Plaintiff's receptive

vocabulary, or ability to understand spoken vocabulary, is average and that "one would

expect her to be able to understand spoken conversation, verbal directions, and most

work-related verbal instructions." (R. 276). Ms. Stansberry further determined that

---

[11] On December 8, 2009, Plaintiff traveled to the Adult Learning Center in Morgantown, West Virginia, and participated in a Test for Adult Basic Education ("TABE test"). (R. 271). The results of the TABE test revealed that Plaintiff possesses: (1) a reading level of 2.2; (2) a math level of 0.9 and (3) a language level of 2.3. (R. 275). Based on these results, Plaintiff received a referral for a vocational assessment. (R. 274).

Plaintiff's top two aptitude scores pertained to clerical perception and verbal comprehension and that, therefore, Plaintiff possesses "the aptitude to be competitive in . . . Building and Grounds Cleaning and Maintenance Occupations[ ] and Transportation and Material Moving Occupations." (R. 277-78).

Based on these findings, Ms. Stansberry concluded that Plaintiff "is job ready for employment options that do not require a GED or further training." (R. 279). Ms. Stansberry further concluded that Plaintiff possesses "the ability to successfully learn on the job . . . [or through] formalized training." (R. 281). When discussing specific recommendations, Ms. Stansberry opined that Plaintiff could immediately work as a hand packer/packager or as a grounds keeping/landscaping worker. (Id.). Additionally, Ms. Stansberry opined that, if Plaintiff received on-the-job training, she could work as a general farm worker or a grounds maintenance worker. (Id.). Ms. Stansberry documented that she could not inform Plaintiff of her conclusions and recommendations "because [Plaintiff] anticipated catching the 12:00 PM bus and did not want to miss the bus to take her home." (R. 279).

## E.    Lifestyle Evidence

### 1.  First Adult Function Report, March 26, 2012

On March 26, 2012, Plaintiff completed her first Adult Function Report.[12] (R. 187-94). In this sparsely completed report, Plaintiff discloses that she is limited in some ways but not in others. For several activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to care for herself and her minor daughter. (R. 188). She is able to prepare their meals, shop in stores, pay bills, count change and handle a

_____

[12] Plaintiff testified during the administrative hearing that her sister helped her complete her application for SSI benefits and the related forms, including her first Adult Function Report. (R. 47).

savings account. (R. 189-90).She is able to use public transportation and leave the house without accompaniment. (R. 190). She is able to get along with others without difficulty and follow spoken instructions. (R. 192). Finally, she is able to volunteer in her community. (R. 191).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her impairments. Plaintiff's impairments affect her abilities to: bend, see, recall information, understand information and use her hands. (R. 291). Due to her impairments, Plaintiff is not able to handle stress well and needs reminded to take her medications.[13] (R. 189, 193).

### 2. Personal Pain Questionnaire, October 19, 2012

On October 19, 2012, Patty Drake, of Legal Aid of West Virginia, Inc., submitted a Personal Pain Questionnaire on behalf of Plaintiff. (R. 214-18). In this questionnaire, Ms. Drake declares that Plaintiff suffers from pain in her back, legs and knees as well as pain in her hands. (R. 214-15). Regarding the pain in Plaintiff's back, legs and knees, Ms. Drake characterizes the pain as constant and aching, stabbing and throbbing in nature. (R. 214). She states that activity aggravates the pain and laying down and taking a bath relieves the pain. (Id.). Ms. Drake explained that Plaintiff takes Aleve for the pain but that it "has . . . stopped working for the most part" and causes nausea. (R. 215).

Regarding the pain in her hands, Ms. Drake characterizes the pain as constant and aching, cramping and throbbing in nature. (Id.). She states that the pain is very

---

[13] Plaintiff later stated that her sister calls her to remind her to take her medications. (R. 222). On August 16, 2014, Plaintiff submitted a form entitled Claimant's Medications, in which she reported that she takes tramadol and Voltaren for pain, an inhaler for her COPD and Robaxin and Xanax for anxiety/panic attacks. (R. 260).

severe, rating it a nine on a scale of one through ten, but that the pain is relieved when Plaintiff rubs her hands together. (R. 216). Ms. Drake explained that, like with her back, leg and knee pain, Plaintiff takes Aleve for her hand pain, which "[s]ometimes" helps." (Id.).

### 3. Second Adult Function Report, October 22, 2012

On October 22, 2012, Ms. Drake submitted Plaintiff's second Adult Function Report. (R. 219-27). In this report, Ms. Drake declares that Plaintiff is unable to work due to the following:

> Can't read or write. Pain in hips and legs. Lack of energy. Medication causes extreme drowsiness. Get out of breath – need inhaler. Hands hurt.

(R. 219). Ms. Drake further declares that Plaintiff suffers from obsessive compulsive disorder and needs "things [to] be smooth [and] in place." (R. 226).

Ms. Drake explains that Plaintiff has become more limited since her last Adult Function Report. Plaintiff's impairments now affect her abilities to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, understand information, follow instructions and use her hands. (R. 225). She is limited to lifting ten pounds and to walking one to one-and-a-half city blocks before requiring a two-to-three minute rest. (Id.). She is not able to follow written instructions, pay attention for long periods of time or handle stress or changes to her routine. (R. 225-26). She also is not able to "play" with or read to her daughter, although they are able to watch television and play board games together. (R. 224).

Despite her limitations, Ms. Drake explains that Plaintiff remains able to perform certain activities. For example, Plaintiff remains able to perform her own personal care, care for her daughter, use public transportation, pay bills and count change. (R. 221,

223). She is able to perform housework such as washing dishes, vacuuming, washing laundry and dusting and can prepare meals, although she "basically [just] heat[s] up stuff." (R. 222). She is also able to follow spoken instructions, although she "often need[s] someone to watch over [her]" when following through with the instructions. (R. 225).

Finally, Ms. Drake detailed Plaintiff's routine activities. Every day, Plaintiff awakens, gets her daughter ready for school and takes her daughter to the bus stop. (R. 221). She then volunteers at her local Boys and Girls Club for four hours. (Id.). In the evening, Plaintiff prepares dinner for herself and her daughter and goes to bed at around 9:00 P.M. (Id.). Every month, Plaintiff spends about two hours shopping for food at a grocery store. (R. 223).

## IV. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.      The claimant has not engaged in substantial gainful activity since February 29, 2012, the application date (20 CFR 416.971 *et seq.*).

2.      The claimant has the following severe impairments: lumbar degenerative disc disease, chronic obstructive pulmonary disorder ("COPD"), anxiety, depression, borderline intellectual functioning, and limited reading/writing capabilities (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform less than a full range of light work as defined in 20 CFR 416.967(b). She can occasionally balance, stoop, crouch, kneel, crawl, and climb ramps and stairs, but she can never climb ladders, ropes, or scaffolds. She must avoid concentrated exposure to wetness, humidity, extreme cold, and irritants, such as fumes, odors, dust, and gases. She requires a sit/stand option that allows for a brief, one to two minute change of position at 30-minute intervals without going off task. Mentally, she is limited to simple, routine, repetitive tasks in a low stress environment defined as having only occasional decision-making, occasional changes in the work setting, and no strict production quotas. She can have occasional interaction with public, co-workers, and supervisors. Finally, she must have no complex verbal or written communication and is limited to reading at a second grade level.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on July 17, 1965[,] and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since February 29, 2012, the date the application was filed (20 CFR 416.920(g)).

(R. 29-36).

## VI.    DISCUSSION

### A.    Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is not supported by substantial evidence and contains errors of law. (See Pl.'s Mot. at 1). Specifically, Plaintiff contends that: (1) the ALJ's finding that Plaintiff's impairments fail to meet Listing 12.05 is not supported by substantial evidence; (2) the ALJ improperly assessed Plaintiff's credibility; (3) the ALJ erred in determining Plaintiff's RFC; (4) the ALJ's determination that a significant number of jobs exist in the national economy that Plaintiff is capable of performing is not supported by substantial evidence and (5) she is entitled to a sentence-six remand. (Pl.'s Br. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 1-2, ECF No. 15-1). Plaintiff requests that the Court reverse the Commissioner's decision and/or remand the case for further proceedings. (Id. at 14-15).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that: (1) the ALJ properly determined that Plaintiff's impairments do not meet or equal Listing 12.05; (2) the ALJ properly

assessed Plaintiff's credibility; (3) the ALJ properly determined Plaintiff's RFC; (4) the ALJ properly relied on the vocational expert's testimony when determining that Plaintiff is capable of performing a significant number of jobs in the national economy and (5) a sentence-six remand is unwarranted. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 4-13, ECF No. 17). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

**B.    Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or

substitute [its] judgment for that of the [ALJ's]." <u>Johnson v. Barnhart</u>, 434 F.3d 650, 653 (4th Cir. 2005).

## C.      Analysis of the Administrative Law Judge's Decision

### 1.   Whether the ALJ Erred in Determining that Plaintiff's Impairments Fail to Meet Listing 12.05

Plaintiff argues that the ALJ erred in determining that Plaintiff's impairments fail to meet Listing 12.05C. (Pl.'s Br. at 6). Specifically, Plaintiff argues that the ALJ erred in finding that Plaintiff does not possess "a valid verbal, performance, or full scale IQ of 60 through 70." (<u>Id.</u> at 7). Defendant argues that the ALJ's determination that Plaintiff does not possess a valid IQ score of 60 through 70 is supported by substantial evidence. (Def.'s Br. at 5).

At step three of the sequential evaluation process, a claimant bears the burden of proving that his or her medical impairments meet or equal the severity of an impairment recorded in the "Listing of Impairments," located at 20 C.F.R. Part 404, Subpt. P, App. 1 (2015). <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). If a claimant meets this burden, then the claimant "establishes a prima facie case of disability." <u>Id.</u> Listing 12.05, the only contested listing in this case, "applies to claims for disability based upon [intellectual disability]." <u>Young v. Bowen</u>, 858 F.2d 951, 953 n.2 (4th Cir. 1988). Under this listing, "intellectual disability" is defined as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age [twenty-two]." 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05. If a claimant fulfills this definition, then the claimant must additionally fulfill one of four other requirements, including:

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

Id.

In the present case, the undersigned finds that the ALJ did not err in determining that Plaintiff's impairments fail to meet Listing 12.05C. At step three of the sequential evaluation process, the ALJ determined that Plaintiff's impairments fail to meet Listing 12.05C because Plaintiff "does not have a valid verbal, performance or full scale IQ of 60 through 70." (R. 31). The ALJ reasoned that, while Dr. Everly determined in his Psychological Evaluation that Plaintiff's full scale IQ is 67, "this is not a valid representation of her intellectual functioning level." (Id.). The ALJ explained that the IQ score is not valid because:

> [Plaintiff] cares for her eight-year-old daughter, pays bills, uses public transportation, manages her WV works and SNAP benefits, and works part-time for the Salvation Army answering phones. Further, this score is also inconsistent with the results of her vocational assessment. Upon examination, her counselors found she was "job ready" for employment that does not require a GED or training and concluded that she has the ability to learn on the job and/or with formalized training.

(Id.).

Plaintiff argues that the ALJ impermissibly "substituted her own opinion and assessment of the facts for [the IQ] test results completed by a qualified medical expert." (Pl.'s Br. at 7). The undersigned disagrees. While Dr. Everly opined in his Psychological Evaluation that Plaintiff's full scale IQ is 67, he documented that, "[d]ue to the error inherent in any assessment instrument, there is a 95% probability that the 'true score' falls between 64 and 72." (R. 291). Therefore, because Dr. Everly could not definitively state that Plaintiff possesses an IQ score of under 70, the ALJ was not

obligated to find that Plaintiff's impairments meet the requirements of Listing 12.05C. Moreover, an ALJ is authorized to discredit an IQ score that is inconsistent with the record. Hancock v. Astrue, 667 F.3d 470, 474 (4th Cir. 2012) (upholding an ALJ's decision to discredit the results of an IQ test when the physician administering the test did not attest to the validity of the IQ score and when the IQ score was inconsistent with the record). Because Plaintiff does not contest the accuracy of the ALJ's reasons for determining that the IQ test result of 67 is inconsistent with the record, Plaintiff's argument has no merit.

### 2. Whether the ALJ Properly Assessed Plaintiff's Credibility

Plaintiff argues that the ALJ's determination that she is "not entirely credible" regarding her mental limitations is based on an incomplete assessment of the record and is not supported by substantial evidence. (Pl.'s Br. at 9, 11). Defendant argues that the ALJ's credibility finding is supported by substantial evidence. (Def.'s Br. at 7).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p sets out several factors for an ALJ to use when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.      The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently

wrong.'" <u>Sencindiver v. Astrue</u>, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 32). Initially, the ALJ determined that Plaintiff had proved that she suffers from medical impairments that could reasonably be expected to cause her alleged symptoms. (<u>Id.</u>). Then, after examining the factors outlined in SSR 96-7p, the ALJ further determined that Plaintiff's "statement[s] concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" in light of the entire record. (<u>Id.</u>).

### i.    Plaintiff's Daily Activities

At step two of the sequential evaluation process, the ALJ discussed Plaintiff's daily activities (factor one). <u>See, e.g.</u>, <u>Smith v. Astrue</u>, 457 F. App'x. 326, 328 (4th Cir. 2011) (rejecting a "per se rule that failure to provide sufficient explanation at [one step] requires remand and holding that [the] ALJ's finding at other steps of [the] sequential evaluation [process] may provide [a] basis for upholding [another step's] finding"). The ALJ noted that, on a typical day, Plaintiff "cares for her personal needs, prepares meals like frozen dinners and soup, performs basic household chores like dusting, vacuuming, doing the dishes, and doing the laundry, and cares for her eight-year-old daughter." (R. 30). The ALJ also noted that Plaintiff routinely "pays bills, uses public transportation, manages her WV works and SNAP benefits, and works part-time for the Salvation Army answering phones." (R. 31). After noting Plaintiff's daily and routine activities, the ALJ determined that Plaintiff's possesses only a mild restriction in her activities of daily living. (R. 30).

### ii. Plaintiff's Pain and Other Symptoms

The ALJ also discussed Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's pain and other symptoms, the ALJ noted that Plaintiff alleges "back, hip, and leg pain, breathing difficulties, depression, anxiety, panic attacks, irritability, fatigue, sleep deficits, a low stress tolerance, and a diminished ability to read and write." (R. 32). The ALJ further noted that Plaintiff alleges that "these symptoms affect her memory, concentration, and understanding as well as her abilities to sit, stand, walk, lift, bend, squat, kneel, reach, use her hands, climb stairs, follow instructions, and complete tasks."[14] (Id.). Regarding factors that precipitate and aggravate her symptoms, the ALJ noted that Plaintiff's symptoms worsen when she does not take her medication as prescribed. (R. 33-34).

### iii. Plaintiff's Medications and Treatment

The ALJ examined Plaintiff's medications (factor four). The ALJ emphasized that Plaintiff has only taken Aleve, tramadol and Skelaxin for her back pain and Combivent and Albuterol "on an as needed basis for her COPD." (R. 32-33). The ALJ noted that these medications do not constitute an aggressive treatment regimen. (Id.).

---

[14] The ALJ documented that Plaintiff's allegations of severe mental symptoms are "significant[ly] inconsisten[t]" with the record. (R. 32-33). The ALJ then refers to, *inter alia*, Plaintiff's Vocational Assessment Report, in which Plaintiff declined an offer to have information read to her, noting that Plaintiff's choice "seems rather inconsistent with . . . a limited reading ability." (R. 33). Plaintiff contends that she declined the offer to have the information read to her because she was trying to get home to her ill granddaughter, not because she could read the information. (Pl.'s Br. at 9-10). However, the ALJ had this information before him at the time he was analyzing the inconsistency in the record and determined that Plaintiff's proffered reason was not credible. (See R. 33, 279). While Plaintiff may not agree with the ALJ's determination, the Court may not re-weigh conflicting evidence or substitute its judgment for that of the ALJ's. Johnson, 434 F.3d at 653.

### iv.    Other Treatment and Measures Used to Relieve Symptoms

Next, the ALJ reviewed treatment other than medication that Plaintiff has received (factor five) as well as measures Plaintiff uses to relieve her symptoms on her own (factor six). Regarding treatment other than medication that Plaintiff has received, the ALJ noted that, while Plaintiff has participated in physical therapy for her back pain, "[s]he has not required aggressive treatment like injection therapy or surgical intervention." (Id.).

Regarding measures Plaintiff uses to relief her symptoms on her own, the ALJ noted that Plaintiff does not appear to employ measures to relieve her symptoms. (See id.). To illustrate, the ALJ noted that Plaintiff has not quit smoking and has not even been compliant with her medications and treatment. (Id.). The ALJ thus concluded that Plaintiff's symptoms "are not as severe as alleged and that she has little interest in improvement." (Id.).

Plaintiff argues that the ALJ erred in holding her noncompliance against her, stating that she had reasons for her decisions to cease taking prescribed medications and canceling multiple heath care appointments. (Pl.'s Br. at 9-11). However, Plaintiff's reasons are all part of the record and were considered by the ALJ. While Plaintiff may disagree with the ALJ's decision to discredit her reasons, the Court's role is not to re-weigh conflicting evidence or substitute its judgment for that of the ALJ's. Johnson, 434 F.3d at 653. Nevertheless, assuming *arguendo* that the ALJ should not have considered Plaintiff's noncompliance when assessing her credibility, such error was harmless in nature. The ALJ did not deny Plaintiff SSI benefits solely because of her noncompliance. Instead, the ALJ considered Plaintiff's noncompliance as only one

factor among many in the credibility assessment. <u>See</u> <u>Emigh v. Comm'r of Soc. Sec.</u>, No. 3:14-CV-36, 2015 WL 545833, at *21 (N.D. W. Va. Feb. 10, 2015) ("The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination.").

### v. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear her reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned finds that the ALJ's credibility determination is supported by substantial evidence and accords it the great weight to which it is entitled.

### 3. Whether the ALJ Erred in Determining Plaintiff's RFC

Plaintiff argues that the ALJ did not consider all of Plaintiff's impairments when formulating the RFC. (Pl.'s Br. at 12). Specifically, Plaintiff argues that the ALJ did not consider her bipolar disorder, headaches, scoliosis, spinal stenosis or arthritis.[15] (<u>Id.</u>). Defendant argues that the ALJ's RFC determination is supported by substantial evidence. (Def.'s Br. at 11).

---

[15] Plaintiff also notes that the ALJ did not specifically address these impairments at step two of the sequential evaluation process. (Pl.'s Br. at 12). However, an ALJ's failure to discuss a particular impairment at step two constitutes harmless error "if the ALJ 'continued through the remaining steps [of the evaluation process] and considered all of the claimant's impairments.'" <u>Pierce v. Colvin</u>, No. 5:14CV37, 2015 WL 136651, at *19 (N.D. W. Va. 2015). In the present case, the ALJ determined that Plaintiff suffered from multiple severe impairments and continued through the remaining steps of the evaluation process. (R. 29). Therefore, the only issue is whether the ALJ considered the identified impairments after step two.

The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946(a) (2011); Farnsworth, 604 F. Supp. 2d at 835. The RFC is what a claimant "can still do despite [his or her] limitations." 20 C.F.R. § 416.945. More specifically, the RFC is "[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)." Dunn v. Colvin, 607 F. App'x 264, 272 (4th Cir. 2015). An RFC assessment requires an ALJ to consider "all the relevant evidence" in the record. 20 C.F.R. § 416.945. Therefore, an ALJ must consider the limitations and restrictions caused by both severe and non-severe impairments. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *6 (N.D. W. Va. Jan. 28, 2015).

In the present case, the undersigned finds that the ALJ did not err in determining Plaintiff's RFC. When determining Plaintiff's RFC, the ALJ did not specifically name the impairments he considered, nor was he required to do so. (R. 31-25). Instead, the ALJ properly focused on the limitations and restrictions that Plaintiff's impairments cause. (Id.). Specifically, the ALJ noted that:

> [Plaintiff] alleges disability stemming from physical and mental impairments, which she claims causes back, hip, and leg pain, breathing difficulties, depression, anxiety, panic attacks, irritability, fatigue, sleep deficits, a low stress tolerance, and a diminished ability to read and write. According to her, these symptoms affect her memory, concentration, and understanding as well as her abilities to sit, stand, walk, lift, bend, squat, kneel, reach, use her hands, climb stairs, follow instructions, and complete tasks.

(R. 32). While Plaintiff argues that the ALJ failed to consider her bipolar disorder, headaches, scoliosis, spinal stenosis and arthritis, she offers no support for her contention. Indeed, Plaintiff fails to identify any limitation or restriction these

impairments cause that the ALJ failed to consider. Therefore, the ALJ's RFC

determination appears to accurately reflect what Plaintiff can still do despite her

limitations and Plaintiff's argument is meritless.

### 4. Whether the ALJ Erred in Determining that a Significant Number of Jobs Exist in the National Economy that Plaintiff is Capable of Performing

Plaintiff argues that the ALJ erred at step five when she determined that a

significant number of jobs exist in the national economy that Plaintiff is capable of

performing. (Pl.'s Br. at 13). Specifically, Plaintiff argues that the record reflects that

Plaintiff "has good days and bad days" and that she would be off task or absent for

more than twenty percent of the work week, which the vocational expert testified would

render her unemployable. (Id.). Defendant argues that the ALJ's decision at step five is

supported by substantial evidence. (Def.'s Br. at 13).

At step five of the "sequential evaluation" process, the burden shifts to the Social

Security Administration to establish jobs exist in the national economy that the claimant

is capable of performing, keeping in mind the claimant's RFC and "vocational

capabilities (age, education, and past work experience) to adjust to a new job." Hall v.

Harris, 658 F.2d 260, 264-65 (4th Cir. 1981). To satisfy this burden, an ALJ may

consider the testimony of a vocational expert. See Morgan v. Barnhart, 142 F. App'x.

716, 720 (4th Cir. 2005). While "questions posed to [a] vocational expert must fairly set

out all of the claimant's impairments, the question[s] need only reflect those impairments

supported by the record." Russell v. Barnhart, 58 F. App'x. 25, 30 (4th Cir. 2003). The

Commissioner may not rely upon the answer to a hypothetical question if the question

fails to fit the facts on record. See Swaim v. Califano, 599 F.2d 1309 (4th Cir. 1979);

Importantly, an ALJ does not make a finding of fact by presenting a hypothetical

question to a vocational expert and may properly ask a vocational expert alternative hypothetical questions. Davis v. Apfel, 162 F.3d 1154 (4th Cir. 1998).

In the present case, the undersigned finds that the ALJ did not err in determining that, while Plaintiff is unable to perform her past relevant work, other jobs exist in significant numbers in the national economy that she is capable of performing. During the administrative hearing, the ALJ asked the vocational expert whether an individual could find work if he or she "were off task [or] were to miss . . . 20 percent of the work week or greater," to which the vocational expert responded in the negative. (R. 75). ALJs customarily ask this question of vocational experts. See, e.g., Linger v. Colvin, No. 1:15-CV-107, 2016 WL 2766070, at *8 (N.D. W. Va. Apr. 22, 2016). However, an ALJ is not required to adopt the limitation that the claimant be allowed to be off task or to be absent for twenty percent of the work week in the claimant's RFC if the limitation is not supported by the record. Davis, 162 F.3d at 1154. In this case, the ALJ determined that the limitation was not supported by the record, which is why she did not include it in her RFC determination. (See R. 31-35). To the contrary, the ALJ included in the RFC that Plaintiff is able to work "without going off task." (R. 31). While Plaintiff may disagree with this determination, a thorough review of the record reveals that it is supported by substantial evidence and, therefore, the Court cannot re-weigh the evidence or substitute its own judgment for that of the ALJ's. Consequently, Plaintiff's argument lacks merit.

**5. Whether Plaintiff is Entitled to a Sentence-Six Remand**

Plaintiff argues that she is entitled to a sentence-six remand because "three treatment records from Valley Health . . . appear to have been omitted from the

Record." (Pl.'s Br. at 14). Defendant argues that the three identified records do not warrant a sentence-six remand. (Def.'s Br. at 13-15).

If a claimant presents evidence that has not been submitted to the ALJ, then the evidence may be considered only for the limited purpose of determining whether a sentence-six remand should be granted pursuant to Section 405(g) of the Social Security Act. See 42 U.S.C. § 405(g) (2010). Under Section 405(g):

> A reviewing court may remand a Social Security case to the Secretary on the basis of newly discovered evidence if four prerequisites are met. The evidence must be relevant to the determination of disability at the time the application was first filed and not merely [duplicative or] cumulative. It must be material to the extent that the Secretary's decision might reasonably have been different had the new evidence been before her. There must be good cause for the claimant's failure to submit the evidence when the claim was before the Secretary, and the claimant must present to the remanding court at least a general showing of the nature of the new evidence.

Wilkins v. Sec'y, Dep't. of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991); Wajler v. Colvin, No. 13CV156, 2014 WL 4681759, at *10 (N.D. W. Va. Sept. 19, 2014). In determining whether to grant a sentence-six remand, a court only considers the new evidence that has come to light and does not "rule in any way as to the correctness of the administrative decision." Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991).

In the present case, the undersigned finds that Plaintiff has failed to prove the four prerequisites for a sentence-six remand for several reasons. First, the three identified records are not material. The three records discuss appointments Plaintiff attended at Valley HealthCare on November 12, 2012, December 10, 2012, and February 22, 2013. (Pl.'s Exs. 1-3, ECF Nos. 15-2, 15-3 & 15-4). However, numerous later-dated records from Valley HealthCare are already part of the record and Plaintiff does not specify any significant information contained in these documents that is not

discussed in the subsequent records.

Plaintiff argues that the records are material because, when assessing Plaintiff's credibility, the ALJ noted that Plaintiff had not been compliant with her treatment and that, after her visit to Valley HealthCare in October of 2012, she did not return for follow-up care for nearly six months. (Pl.'s Br. at 11). The undersigned disagrees. As previously discussed, the ALJ's credibility assessment did not hinge on whether Plaintiff was compliant with her treatment. See Part VI.C.2.v. To the contrary, the ALJ considered Plaintiff's noncompliance as only one factor among many when assessing her credibility. Therefore, it cannot reasonably be believed that the Commissioner's decision would have been different if these records had been considered.

Second, Plaintiff has not established good cause for her failure to submit the records earlier. Plaintiff states that the omission of the records was inadvertent and that she does not know if the omission was caused by staff or machine error. (Pl.'s Br. at 14). Therefore, because the records were previously available to Plaintiff and there is no known reason why they were not submitted earlier, Plaintiff cannot establish good cause. To hold otherwise would open the door for all claimants to request sentence-six remands without reason whenever they desire an additional record to be considered. Consequently, Plaintiff is not entitled to a sentence-six remand.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 15) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 16) be **GRANTED**, the

decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 19th day of September, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE